UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
:
AMERICAN HOME ENERGY INC., HOMEENERGY    :    21-CV-1337 (ARR) (RR)
INC., ENERGYINVEST LLC, and THOMAS    :
ENZENDORFER,    :    NOT FOR ELECTRONIC
:    OR PRINT PUBLICATION
*Plaintiffs*,    :
:
-against-    :    **OPINION & ORDER**
:
AEC YIELD CAPITAL LLC, AEC 51 YIELD, LLC, and    :
SWISS ALP ASSET MANAGEMENT GmbH,    :
:
*Defendants*.    X

----------------------------------------------------------------

ROSS, United States District Judge:

On April 5, 2022, plaintiffs filed a Second Amended Complaint for breach of contract and fraud stemming from a failed arrangement between the parties for the sale and financing of solar energy installation contracts. Defendants now move to dismiss this Complaint in its entirety. Defendants' motion to dismiss is granted as to plaintiffs' breach of contract claim on behalf of HomeEnergy Inc. and as to plaintiffs' fraud claims on behalf of all plaintiffs. The motion is denied as to plaintiffs' breach of contract claim on behalf of American Home Energy Inc.

## BACKGROUND

### *Factual Background*

Plaintiff Thomas Enzendorfer is the sole member of plaintiff EnergyInvest LLC ("EnergyInvest"), which in turn is the sole shareholder of plaintiffs American Home Energy Inc. (the "Buyer") and HomeEnergy Inc. ("HomeEnergy"). Sec. Am. Compl. ("Compl.") ¶ 3, ECF No. 41. HomeEnergy and the Buyer install and service solar energy systems for businesses and sometimes purchase customer contracts from other solar energy providers to complete installation.

1

*Id.* ¶¶ 2, 4. Defendant AEC Yield Capital LLC (the "Seller") provides financing, *inter alia*, to businesses in the energy sector and is a Brooklyn-based representative and management agent of defendant Swiss ALP Asset Management GmbH ("Swiss ALP"). *Id.* ¶¶ 5, 7. The Seller is co-owned by Richard Rudy and Jack Doueck. *Id.* ¶ 6. Mr. Enzendorfer met Mr. Rudy through a mutual colleague in the energy services industry. *Id.* ¶ 31.

In mid-January 2018, Mr. Rudy approached Mr. Enzendorfer with a proposal to purchase 489 solar energy installation contracts from Syntrol Plumbing, Heating and Air, Inc. ("Syntrol"), a company that the Seller had financed on behalf of, and using assets provided by, Swiss ALP. *Id.* ¶¶ 8–9, 32, 35. Mr. Rudy stated that Swiss ALP had "lost patience" with Syntrol and the Seller would be foreclosing on Syntrol at the end of January. *Id.* ¶¶ 9, 12. During a meeting on or around January 10, 2018, Mr. Rudy explained that the Seller sought an entity that would fulfill Syntrol's customer contracts and would repay Syntrol's loan and financing obligations to the Seller and Swiss ALP. *Id.* ¶¶ 9, 13, 34, 40. If the Seller did not locate a company to assume the contracts, the contracts risked being "extinguished" with Syntrol's imminent collapse. *Id.* ¶ 36. Mr. Rudy also said that Swiss ALP risked financial damage if Syntrol breached these contracts, which would require Swiss ALP to disclose to its investors the losses it incurred on the Syntrol assets. *Id.* ¶¶ 9, 11, 34. Mr. Rudy presented this offer as requiring only six months of work and predicted that Mr. Enzendorfer not only would make at least $3,000,000 after paying back financing from the Seller and Swiss ALP but also would "gain[] a new financial supporter who would support future ventures." *Id.* ¶ 10. Mr. Rudy represented that, while Syntrol itself was no longer a viable business, its solar energy installation contracts were "legitimate and valuable." *Id.* ¶ 37. Given the short timeline, plaintiffs did not conduct due diligence on the Seller or Syntrol. *Id.* ¶¶ 14, 39. Instead, plaintiffs relied on the Seller's representations, financial information provided by the Seller,

documents and other information jointly provided by the Seller and Swiss ALP, and Mr. Enzendorfer's familiarity with the mutual business associate who had introduced him to Mr. Rudy. *Id.*

Sometime between mid-January and January 31, 2018, Mr. Rudy asked Mr. Enzendorfer to loan Syntrol $29,000 for health insurance and other bills. *Id.* ¶ 38. Mr. Rudy claimed that "it was too late to ask Swiss ALP for these funds[,] [that] he did not have that much cash available[,] [and] that nonpayment could trigger an implosion of Syntrol prior to closing." *Id.* Mr. Rudy promised to reimburse Mr. Enzendorfer. *Id.* On January 25, 2018, Mr. Enzendorfer wired $29,000 to Syntrol. *Id.* When Mr. Enzendorfer asked Mr. Rudy to pay him back, Mr. Rudy did not do so, and instead, according to the Complaint, "manipulated a loan" to the Buyer in some unspecified way. *Id.*

On January 26, 2018, the Seller foreclosed upon Syntrol's assets. *Id.* ¶¶ 15, 41. On January 31, the Buyer and the Seller entered into a Purchase and Sale Agreement (the "Purchase Agreement"). *Id.* ¶ 42. Under the Purchase Agreement, the Buyer purchased from the Seller Syntrol's customer contracts, software licenses, and related rights and property (the "Syntrol assets"), assets that the Seller represented were worth $6,253,076.27. *Id.* ¶¶ 43–44. To finance the $3,859,589 purchase price, the Buyer executed a Cash Flow Note for $2,609,589 and a Term Note for $1,250,000. *Id.* ¶¶ 43, 45–47. The Buyer pledged the Syntrol assets as collateral to secure these promissory notes pursuant to a Security Agreement, also dated January 31. *Id.* ¶ 48. On the same date, the parties executed an asset-based loan agreement (the "Loan Agreement"), pursuant to which the Buyer would obtain loans from the Seller "for the purpose of completing customer installations, procuring equipment for such installations[,] and for general corporate and business purposes" related to the Syntrol assets. *Id.* ¶¶ 49–50.

As relevant here, the Purchase Agreement contains indemnification clauses for both parties. At issue is the Seller's Indemnification clause (the "indemnification clause"), which reads:

> For a period of four years from and after the Delivery Date, Seller shall indemnify, hold harmless, and defend Buyer and its agents, attorneys, directors, officers, employees, shareholders, principles, corporate parent, affiliates, successors and assigns (the "Buyer Indemnified Parties"), from and against any losses, causes of action, liabilities, claims, demands, obligations, damages, costs, and expenses, including reasonable attorneys' fees, to which the Buyer Indemnified Parties shall become liable to any third party on account of (i) any breach of any of Seller's representations, warranties, covenants or agreements in this Agreement, as the same may be limited by this Agreement, and (ii) claims made by junior secured creditors of Syntrol (CPF Asset Management, LLC, Ace Funding Source LLC and Corporate Service Company, as Representative), including but not limited to claims based on their failure to receive notice of the Syntrol Foreclosure.

Decl. of Brendan F. Quigley in Supp. Mot. Dismiss ("Quigley Decl."), Ex. A ("Purchase Agreement"), ¶ 9.3, ECF No. 45-1.[1]

After closing on the Purchase Agreement, plaintiffs discovered that the vast majority of the 489 Syntrol contracts purchased had no value. Compl. ¶ 54. Prior to the execution of the Purchase Agreement, forty-five contracts had been fully installed and paid and fifty-one contracts had been canceled. *Id.* ¶¶ 55, 57. Sixty-six of the contracts were duplicates. *Id.* ¶ 59. More than half of the contracts did not even exist: 232 of the contracts were in fact business leads, not executed agreements, and a further twenty-five contracts were not supported by any sales record. *Id.* ¶¶ 56,

---

[1] In ruling on a motion to dismiss, I may look beyond the complaint and its attachments to documents incorporated by reference and documents "'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citation omitted). A document is considered "integral" to the complaint where the complaint "relies heavily upon its terms and effect." *Id.* at 153 (citation omitted). In a breach of contract suit, the contract is integral to the complaint. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (noting that "[i]n most instances" where a document is purportedly integral to a complaint, "the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls"). Moreover, plaintiffs did not challenge defendants' citing the Purchase Agreement or other agreements in their motion to dismiss. *See generally* Pls.' Opp'n Mot. Dismiss ("Opp'n"), ECF No. 48. I therefore consider the Purchase Agreement in ruling on the motion to dismiss.

58. Plaintiffs do not know about the status of another fifty-one contracts. *Id.* ¶ 61. Ultimately, plaintiffs possessed only nineteen "legitimate, binding, collectable, ongoing" Syntrol contracts. *Id.* ¶ 60. Plaintiffs have since learned that the value of the Syntrol assets on January 31, 2018, was $2,909,040.26, not the $6,253,076.27 the Seller had claimed when the Purchase Agreement was executed. *Id.* ¶ 62.

Plaintiffs soon experienced cash flow problems. *Id.* ¶ 64. During phone calls with Mr. Enzendorfer in February and March 2018, Mr. Rudy denied that he or his colleagues knew of any problems with the Syntrol Assets. *Id.* ¶ 65. During a meeting on or about March 30, 2018, Mr. Rudy told Mr. Enzendorfer that the Seller and Swiss ALP could not "write off" the obligations and debts set forth in the Purchase Agreement, but that they "would structure new loans and financing with favorable terms that would allow [the Buyer] to recover from the losses sustained as a result of the Purchase Agreement." *Id.* ¶¶ 66–67.

In November 2018, Mr. Enzendorfer met with Mr. Rudy and two representatives of Swiss ALP, Patric Wisard and Thomas Fischer. *Id.* ¶ 69. During this meeting, Messrs. Wisard and Fischer "acknowledged that the Syntrol [a]ssets were largely bogus." *Id.* Mr. Wisard also admitted that disclosing the true nature of the Syntrol assets would "destroy" Swiss ALP's reputation. *Id.* ¶ 70. If Mr. Enzendorfer did not disclose the condition of the Syntrol assets and did not declare bankruptcy, Mr. Wisard offered, Swiss ALP would provide loans and financing that would enable the Buyer and HomeEnergy "to recover and financially thrive." *Id.* ¶ 69. Mr. Fischer emphasized "the many other opportunities [Mr. Enzendorfer and Swiss ALP] could embark on" together. *Id.*

In June or July 2019, Mr. Enzendorfer and other representatives of plaintiffs met with the Seller and presented the Seller with evidence that the defendants had "failed to provide credit for work that [p]laintiffs had performed on the few *bona fide* Syntrol [a]ssets" and had "miscalculated

other revenues and proceeds for contracts . . . under the [Agreement]." *Id.* ¶¶ 80–81. The Seller subsequently reimbursed the Buyer between $250,000 and $300,000 to correct these errors. *Id.* ¶ 85. Despite representing to plaintiffs that the amount was a refund, the Seller increased plaintiffs' loan balance by the same amount. *Id.* ¶ 86.

In late July 2019, Mr. Enzendorfer met with Messrs. Wisard and Fisher and another Swiss ALP representative, Andreas Berger, to request a debt reduction, a restructuring of the loan obligations, new financing, and an end to the Purchase Agreement. *Id.* ¶ 88–89. Mr. Wisard claimed that he had been unaware of a fraud involving the Syntrol assets and that Swiss ALP had reviewed the accounting and it was accurate. *Id.* ¶ 88. Mr. Wisard denied Mr. Enzendorfer's request to release the Buyer from the Purchase Agreement but offered additional loan and financing agreements and stated that Swiss ALP would become exclusively responsible for the financial arrangements moving forward. *Id.* ¶¶ 88, 91. Since the Buyer was no longer financially capable of making payments under the Purchase Agreement, the meeting attendees agreed that HomeEnergy would be a party to all loan and financing agreements, including amendments to the Loan Agreement, executed after January 2020, and that HomeEnergy would fulfill the payments under the existing agreements. *Id.* ¶ 89. Mr. Wisard refused to amend the existing agreements to replace the Buyer with HomeEnergy, however, because Swiss ALP would have to disclose such revisions to their investors. *Id.* ¶ 90. Desperate for a "financial lifeline," plaintiffs agreed to take on further financing from Swiss ALP. *Id.* ¶¶ 92–93.

After the original Loan Agreement, the parties subsequently entered into approximately twelve amendments to the Loan Agreement and additional loan and financial agreements. *Id.* ¶ 94. From February 2 to December 31, 2020, HomeEnergy made payments to Swiss ALP and related entities totaling $9,501,781. *Id.*

At an unspecified time between executing the Purchase Agreement and filing this Complaint, plaintiffs gained access to a document created by the Seller that detailed how the Seller and Swiss ALP were applying loan payments by the Buyer and HomeEnergy (the "Breakdown document"). *Id.* ¶ 99. That document shows that "essentially all funds paid [by the Buyer and HomeEnergy] were . . . applied to the payment of assets or . . . debt that Swiss ALP and [the Seller] were fully aware had been sold, collected or were non-existent." *Id.* ¶ 52. Upon reviewing the Breakdown document, plaintiffs learned that the Seller and Swiss ALP under-recorded revenues that they received from plaintiffs for projects financed by Swiss ALP, "thereby drastically increasing the amount of interest assessed to, and paid by" the Buyer and HomeEnergy. *Id.* ¶ 101. As a result, the Buyer and HomeEnergy "paid over [$3,375,000] more than [they] had borrowed." *Id.* ¶ 103. Plaintiffs also realized that the Seller and Swiss ALP "regularly delayed crediting [] revenues" from the Buyer and HomeEnergy, improperly inflating interest charged, and also applied Syntrol's debts to the Buyer's account, thus "demanding double payment" and further inflating the interest owed by plaintiffs. *Id.* ¶¶ 105, 107. These distortions allowed Swiss ALP and the Seller to overstate the Buyer's and HomeEnergy's loan balances by $4,200,000 and charge them "17% interest o[n] fraudulent debt entries for over three years." *Id.* ¶ 108.

Plaintiffs also faced lawsuits from Syntrol's lenders. On February 9, 2018, Consolidated Electrical Distributors ("Consolidated") sued the Buyer for $629,562.88 worth of materials it had sold to Syntrol and for which Syntrol had not paid. *Id.* ¶ 110. Defendants pressured the Buyer to settle the case, which it did on September 6, 2018. *Id.* In March 2019, Sunnova Energy International Inc. ("Sunnova") sued the Buyer for debts owed by Syntrol. *Id.* ¶ 111. Based on defendants' assurances, pressure, and promises that defendants would make plaintiffs whole, plaintiffs settled with Sunnova in November 2020. *Id.* ¶ 112. To cover the legal fees and

settlements, Swiss ALP issued a loan to Mr. Enzendorfer and EnergyInvest. *Id.* ¶ 113. EnergyInvest put 86,666 HomeEnergy shares in escrow as collateral for the loan. *Id.* ¶ 114.

Additionally, on August 30, 2018, an interpleader action was brought to resolve inconsistent liabilities among multiple parties claiming entitlements to Syntrol's assets and/or accounts receivable. *Id.* ¶ 116 (citing Compl., *Solar Spectrum LLC v. AEC Yield Cap., LLC*, No. 18-CV-7950 (GBD) (S.D.N.Y. Aug. 30, 2018)).[2] The action named the Seller as a defendant, *id.* ¶ 117, and the Seller was served with the complaint on October 12, 2018, Proof of Service, 18-CV-7950, ECF No. 35. Despite having sold the Syntrol assets it owned to the Buyer, the Seller appeared in the action and filed an answer asserting counterclaims. Compl. ¶ 117; Answer, 18-CV-7950, ECF No. 45. In this answer, the Seller claimed "a first priority security interest" in the funds at issue. Answer 1, 18-CV-7950. On February 14, 2019, the Buyer and the Seller jointly moved to substitute the Buyer for the Seller as a party in the action.[3] Mot. to Substitute Party, 18-CV-7950, ECF No. 65. The motion was granted on June 25, 2019. Order, 18-CV-7950, ECF No. 98. When the Buyer settled with the other parties to the interpleader action in February 2020, the Buyer received a larger sum than any other party, *see* Stipulation of Settlement & Order of

---

[2] Plaintiffs argue that defendants' citation to the interpleader action's docket sheet in their motion to dismiss converts the motion into one for summary judgment. Opp'n 10. Defendants are correct that I may consider the docket for the interpleader action without converting their motion into one for summary judgment: "[D]ocket sheets are public records of which [I may] take judicial notice," *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).

[3] Plaintiffs contend that the Seller did not notify the Buyer of the action until it was threatened with sanctions by the court. The public docket, however, does not support plaintiffs' claim. *See generally* 18-CV-7950. Plaintiffs had an opportunity to explain this discrepancy in their opposition to the motion to dismiss, but instead of engaging with the evidence from the docket, they merely reiterated their version of events. *See* Opp'n 10–11. Because plaintiffs have waived their opportunity to explain themselves and their pleadings regarding how the Buyer came to be involved in the interpleader action are contradicted by the public docket, I do not consider plaintiffs' account. *See In re Livent, Inc. Noteholders Secs. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) (noting that a court is not required to "accept as truth . . . pleadings . . . that are contradicted . . . by facts of which the court may take judicial notice" (collecting cases)).

Dismissal, 18-CV-7950, ECF No. 136, but also incurred significant legal fees "caused by [the Seller's] misconduct in the proceeding," Compl. ¶ 120.

***Procedural Background***

On March 12, 2021, plaintiffs filed suit against defendants for breach of contract, breach of the covenant of good faith and fair dealing, fraud, and declaratory relief. Compl. 17, ECF No. 1. On March 19, 2021, defendants the Seller and AEC 51 Yield, LLC filed suit against the Buyer for breaches of contract and of the duty of good faith and fair dealing. Compl. 19–29, *AEC Yield Cap., LLC v. Am. Home Energy, Inc.*, No. 21-CV-1479 (ARR), ECF No. 1. On May 17, 2021, I consolidated the two actions and designated 21-CV-1337 as the lead case. Op. & Order, ECF No. 22. As relevant to the instant motion, on February 28, 2022, I granted in part defendants' motion to dismiss the complaint, dismissing with prejudice (1) all claims brought by the Buyer, except for its claim that the Seller breached the indemnification clause by asserting rights in the interpleader action; (2) HomeEnergy and EnergyInvest's breach of contract claim regarding the Purchase Agreement; and (3) plaintiffs' breach of good faith and fair dealing claim. Op. & Order ("Feb. Op.") 33, ECF No. 33.

Plaintiffs filed this amended Complaint on April 5, 2022. The Complaint (1) reasserts, and adds new allegations concerning, the breach of contract claim on behalf of the Buyer, regarding the indemnification clause; (2) asserts a new breach of contract claim on behalf of HomeEnergy, regarding the loan and financing agreements to which HomeEnergy is a party; and (3) reasserts, adding new allegations, a fraud claim on behalf of all plaintiffs. Compl. 25. On April 18, 2022, defendants moved to dismiss the Complaint in its entirety. Mot. to Dismiss, ECF No. 44; Mem. in Supp. of Mot. to Dismiss ("Mem."), ECF No. 47.

**LEGAL STANDARD**

On a motion to dismiss under Rule 12(b)(6), I accept all factual allegations in the Complaint as true and draw all reasonable inferences in favor of the non-moving party. *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013). I will not, however accept allegations in the complaint if they are clearly contradicted by other statements in the Complaint or by relevant documents that I have authority to consider. *See TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013); *In re Livent, Inc. Noteholders Secs. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). To survive a motion to dismiss, plaintiffs need allege only "enough facts to state a claim to relief that is plausible on its face," raising "a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**DISCUSSION**

I.   **Defendants' Motion to Dismiss the Buyer's Breach of Contract Claim Regarding the Indemnification Clause Is Denied.**

Defendants move to dismiss the Buyer's breach of contract claim, arguing that plaintiffs have inadequately stated a claim for breach of the Purchase Agreement's indemnification clause because (1) the Consolidated and Sunnova settlements that the Buyer paid do not fall within the ambit of the indemnification clause, and (2) the Seller's conduct in the interpleader action did not breach the contractually implied covenant of good faith and fair dealing, and therefore did not

10

require indemnification. Mem. 10–12. I need not address this first ground because I have already noted in this action that the indemnification clause does not include either Consolidated or Sunnova among the enumerated creditors whose claims are covered by the clause, Feb. Op. 19, and plaintiffs do not dispute this conclusion, *see* Opp'n 10–12. As to the second ground, I find that plaintiffs have sufficiently pleaded that the Seller's conduct during the course of performance of the contract breached the indemnification clause and therefore, I deny defendants' motion to dismiss this claim.

Under New York law, "a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007). This implied covenant of good faith and fair dealing "encompass[es] any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 501 (N.Y. 2002) (citation omitted). This includes a pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* at 500 (citation omitted). The covenant does not encompass, however, any obligation "that would be inconsistent with other terms of the contractual relationship." *Id.* (citation omitted).

Plaintiffs plead violations of the covenant on the ground that the Seller did not inform the Buyer of the interpleader action for as long as four months and represented in the action that it was entitled to the Syntrol assets, despite having sold the assets to the Buyer eight months earlier. Compl. ¶¶ 119–20. Plaintiffs imply that this behavior might have been motivated by the fact that Swiss ALP and the Seller were shareholders of Syntrol, a fact that was not disclosed to the plaintiffs at the time. *Id.* ¶ 122. Plaintiffs assert that this interference caused the Buyer to incur

significant legal fees when it ultimately settled the interpleader action. *Id.* ¶ 120. Defendants argue that the fact that the Buyer and Seller jointly moved for substitution of a party shows that the Seller did not breach a duty to the Buyer and that, moreover, the Buyer was not damaged because, among the parties to the action, it received the most money from the settlement. Mem. 10–11.

As in my prior opinion, *see* Feb. Op. 21, I find that plaintiffs have sufficiently pleaded that the Seller's failing to notify the Buyer of the interpleader action and representing in the action that it was entitled to the Syntrol assets breached the covenant of good faith and fair dealing implied in the Purchase Agreement. After receiving service of the complaint in the interpleader action, which concerned assets it had sold more than eight months before, the Seller not only did not inform the Buyer about the action until four months later, but also filed an answer claiming entitlement to those assets. It is implausible that the Seller did not know that it had long ago sold those assets. The Seller therefore deprived the Buyer of its right to participate in the interpleader action for four months. Plaintiffs plead that, as a result of these actions, they received less in the settlement than they would have without the Seller's interference and incurred significant legal fees. Plaintiffs have pleaded a plausible causal connection between the Seller's conduct and their financial injuries, which are covered by the indemnification clause. Whether plaintiffs in fact incurred greater legal fees or lost the potential for a larger settlement is a fact-intensive question better illuminated by discovery. Defendants' motion to dismiss this claim is therefore denied.

## II. Defendants' Motion to Dismiss HomeEnergy's Breach of Contract Claim Regarding the Subsequent Agreements Is Granted.

Defendants move to dismiss plaintiffs' breach of contract claim on behalf of HomeEnergy on the ground that the Complaint does not sufficiently plead the existence of any contract entered into by HomeEnergy. Mem. 12. The elements of a breach of contract claim are (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other

party, and (4) damages attributable to the breach. *Uddo v. DeLuca*, 425 F. Supp. 3d 138, 150

(E.D.N.Y. 2019) (citing *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 893 N.Y.S.2d 237, 239 (N.Y.

App. Div. 2010)). The basis for plaintiffs' breach of contract claim on behalf of HomeEnergy is

that that the Buyer and the Seller "agreed that all loan and financing agreements after January 2020

. . . would involve HomeEnergy." Compl. ¶ 89. But in the Complaint, plaintiffs fail to identify any

agreements executed after January 2020. The Complaint merely states that, "following the original

Loan Agreement, the Parties entered into approximately [twelve] Amendments to the Loan

Agreement and additional loan and financing agreements." *Id.* ¶ 94. Plaintiffs do not identify when

these agreements were executed. Nor can I infer that these agreements to which plaintiffs refer

were executed after January 2020 when the only examples of these agreements in the Complaint

were executed in 2018 and 2019. *See id.* ¶¶ 63, 75. While plaintiffs insist that they have pleaded

the existence of five contracts that HomeEnergy entered into with defendants, Opp'n 15, I find no

such contracts identified in the Complaint.[4] HomeEnergy's breach of contract claim against

defendants is therefore dismissed.

**III.    Defendants' Motion to Dismiss Plaintiffs' Fraud Claims Is Granted.**

Defendants move to dismiss plaintiffs' fraud claim for failing to plead the necessary

elements of a state law fraud claim and failing to meet the particularity requirements of Federal

Rule of Civil Procedure 9(b). Mem. 14–17. Plaintiffs respond that they have more than adequately

pleaded (1) that Swiss ALP and the Seller fraudulently induced HomeEnergy, Mr. Enzendorfer,

and EnergyInvest to enter into loan and financing agreements subsequent to the execution of the

---

[4] The plaintiffs cite paragraphs 89, 93–96, 98, 103–05, 108, and 145 of the Complaint for this
proposition. Opp'n 9. However, none of these paragraphs identify a specific agreement to which
HomeEnergy is a party, nor does any identify which provisions of the alleged agreements were
breached. Similarly, the plaintiffs repeatedly refer to certain exhibits which are neither attached to
the Complaint nor filed on the docket and, accordingly, I cannot consider them.

Purchase Agreement, Loan Agreement, and Security Agreement,[5] (2) that these defendants also tricked plaintiffs into paying more than was owed by deliberately manipulating their accounting of the Buyer and HomeEnergy's payments under those agreements, and (3) that Mr. Rudy defrauded Mr. Enzendorfer by promising to repay the latter's $29,000 emergency loan to Syntrol. I have previously ruled that the Buyer sufficiently pleaded fraud claims with respect to the Seller's statement that there were $250,000 to $300,000 in "accounting errors" which were allegedly credited to the Buyer but then offset by an undisclosed increase in Buyer's loan balances by the same amount. Feb. Op. 23–24. I have also ruled that the Buyer could not sustain a fraudulent inducement claim based on representations made before the Agreement was signed. *Id.* at 22 n.12. Neither prior ruling is altered by the below discussion.

To state a claim for fraud, plaintiffs must allege: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006). Fraud claims must be pleaded consistent with the particularity requirement of Fed. R. Civ. P. 9(b). *Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 558 (S.D.N.Y. 2009). Specifically, plaintiffs must identify the fraudulent statement or omission, who made it, when and where the statement or omission was made, and why the statement or omission was fraudulent. *Fin. Guar. Ins. Co. v. Putnam Advisory Co*, 783 F.3d 395, 402–03 (2d Cir. 2015).

---

[5] Because these plaintiffs are not parties to the Purchase Agreement, Loan Agreement, and Security Agreement, *cf.* Feb. Op. 16, I do not evaluate the fraud claims as encompassing these contracts. Rather, these fraud claims are based on the twelve amendments and other loan and financing agreements executed subsequent to these original agreements, *see supra* Discussion II.

### 1.  All Fraudulent Inducement Claims are Insufficiently Pleaded

Plaintiffs fail to plead their fraudulent inducement theory because they insufficiently allege that they entered into contracts in reliance on defendants' promises. To successfully state a claim for fraudulent inducement, "a plaintiff must show a material representation, known to be false, made with the intention of inducing reliance, upon which it actually relied, consequentially sustaining a detriment." *Frank Crystal & Co. v. Dillmann*, 925 N.Y.S.2d 430, 431 (N.Y. App. Div. 2011) (internal quotation marks, citation, and alterations omitted). Where the inducement is to enter into a contract, it logically follows that to sufficiently plead the fourth element of the claim— that a plaintiff "actually relied" on a promise intended to induce it to contract—the plaintiff must plead that *it actually entered an agreement* based on the false representation. But the Complaint does not specifically identify any agreements into which HomeEnergy, EnergyInvest or Mr. Enzendorfer entered into as a result of a false representation,[6] or any other action that these plaintiffs took to their detriment, in reliance on defendants' promises. Accordingly, these claims are dismissed.

### 2.  Fraud Claims Based on the Breakdown Document Are Insufficiently Pleaded and Are Not Collateral to the Underlying Contracts

Plaintiffs also advance fraud claims based on defendants' misapplication of and failure to properly account for payments made by the Buyer and HomeEnergy under the various agreements. These allegations were not included in the original Complaint, *see* ECF No. 1, and I now consider

---

[6] While plaintiffs plead with particularity several agreements the Buyer entered into, the Buyer is barred from bringing the fraudulent inducement claim based on pre-Agreement representations, *see* Feb. Op. 13. While plaintiffs have pleaded that HomeEnergy entered into several agreements, they do not identify which ones. And the only agreement that plaintiffs have identified Mr. Enzendorfer or EnergyInvest entered into is the December 2020 loan "to cover the legal fees and settlements" from Syntrol's creditors. Compl. ¶ 113. Plaintiffs do not identify a false representation that induced Mr. Enzendorfer or EnergyInvest to enter into this agreement. *See generally id.* Nor is this agreement discussed in the plaintiffs' briefing. *See generally* Opp'n.

them for the first time. Plaintiffs base this subset of their fraud claim on the existence of the Breakdown document, which purportedly shows deliberate misapplication by defendants of the Buyer and HomeEnergy's loan payments. Compl. ¶¶ 51–52. Plaintiffs advance both a fraudulent inducement theory and a general fraud theory based on the Breakdown document. *See id.* ¶ 149 ("Swiss ALP and AEC continued to make multiple material misrepresentations to Plaintiffs to convince them to secure additional financing . . . and to continue to make payments to Defendants."); Opp'n 19 ("As a result, and in reliance upon these knowingly false representations and promises [that the accounting was accurate], Plaintiffs agreed with Swiss ALP to enter into loan and financing agreements . . . ."); *id.* at 21 (defendants' "falsely delayed accounting . . . resulted in delaying the offsetting of [plaintiffs'] debt obligations and increasing the interest obligations of AHE and . . . HomeEnergy, charging sometimes as much as nine weeks or more of extra interest on the debt."); *id.* ("Defendants overstated the loan balances by $4,200,000, charging [Buyer and HomeEnergy] 17% interest on fraudulent debt entries for over three years.").

The allegations of accounting fraud do not change the fact that the plaintiffs have not adequately pleaded a fraudulent inducement claim based on the defendants' accounting for payments. As with the other fraudulent inducement claims, plaintiffs have not specifically alleged which contracts the Buyer, Enzendorfer, HomeEnergy, or EnergyInvest entered into on the basis of the defendants' allegedly fraudulent accounting. Allegations that these entities entered into later, unspecified agreements are insufficient to satisfy the heightened pleading standard for fraud.

As to the plaintiffs' contentions that the accounting mistreatment constitutes fraud because it increased the amounts owed by the Buyer and HomeEnergy, the claims are not collateral to the underlying agreements before me and, to the extent these claims are based on unidentified agreements, fail to state a claim for the same reason.

Fraud and breach of contract claims may be brought separately under New York law only where the plaintiff demonstrates, *inter alia*, "a fraudulent misrepresentation collateral or extraneous to the contract." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). A plaintiff may also "demonstrate a legal duty separate from the duty to perform under the contract" or "seek special damages that are caused by the misrepresentation and unrecoverable as contract damages". *Id.* Plaintiffs have not identified a separate legal duty allegedly violated by the defendants, nor do they identify damages that would be unrecoverable under a breach of contract theory. *See* Compl. ¶ 152 (averring that damages resulting from the misapplication of payments are "in excess of $10,000,000"); *Osan Ltd v. Accenture LLP*, 454 F. Supp. 2d 46, 56 n.10 (E.D.N.Y. 2006) (noting that punitive damages are not considered "special damages" under this analysis because "punitive damages are not regarded as being caused by reliance on a party's misrepresentations"). And nothing in either the Complaint or plaintiffs' briefing suggests why its accounting fraud claim is collateral to the contracts before the Court. Although plaintiffs contend that "the fraud claims . . . are not contingent upon, or grounded in, the [Purchase Agreement]," Opp'n 16, they also aver that "[d]efendants were obligated to provide regular accounting records identifying application of [payments] to repayment of the multiple loan and financing agreements and then make the appropriate distribution. *Id.* at 20 (citing Compl. ¶ 51). The cited portion of the Complaint refers to the parties' arrangement "that payment for all of the work related to the Syntrol Assets and any subsequent work performed by [p]laintiff financed by [d]efendants would be made into a Lockbox[,]" and that "[d]efendants promised that they would provide regular accounting records identifying application of those funds to repayment of the financing arrangements and amounts due and owing to [p]laintiffs *pursuant to the Loan Agreement*, and then make the appropriate distribution." Compl. ¶ 51 (emphasis added). Thus, the

17

plaintiffs acknowledge that the proper application of Buyer's payments to Seller, at least under the Loan Agreement, is governed by that contract. Defendants also identify pertinent language in the Security Agreement, the Term Note, and the Cash Flow Note discussing the Seller's application of payments received pursuant to those contracts. Mem. 16; Quigley Decl. Ex. B., Security Agreement § 4.1(f), ECF No. 45-1 at 50; Decl. of Brendan F. Quigley in Supp. Reply, Ex. A § 7(a) (Term Note), ECF No. 50-1 at 4; *id.* Ex. B § 2 (Cash Flow Note), ECF No. 50-2 at 2. The plaintiffs do not address the defendants' citation of these agreements beyond their conclusory statement that the claims "are not contingent upon, or grounded in, the [Purchase Agreement]." Opp'n 16.

I find that the claims based on the defendants' alleged misapplication of payments received from the Buyer are not collateral to the contracts in the record and therefore should be treated as a breach of contract claim. The substance of the Buyer's claims is that the defendants failed to apply payments made in a proper fashion. The manner in which defendants were to apply payments was addressed in the various agreements. Accordingly, the Buyer cannot sustain a separate claim for fraud based on breach of procedures addressed by the underlying agreements. *See Vitolo v. Mentor H/S, Inc.*, 213 F. App'x 16, 18 (2d Cir. 2007) (summary order) (holding rate of product failure "directly related" to the contract between seller and buyer); *Galderma Labs, L.P. v. Cherian*, No. 19 CV 4560 (PKC)(RML), 2020 WL 9813021, at *4 (E.D.N.Y. Aug. 5, 2020) (report and recommendation) (concluding allegedly fraudulent submission of orders was duplicative of claim for breach of contract governing terms of reimbursement); *Krantz v. Chateau Stores of Can. Ltd.*, 683 N.Y.S.2d 24, 25 (N.Y. App. Div. 1998) (holding a false statement of net profits was not collateral to a contract where terms of payment depended in part upon a party's net profits); *see also Wild Bunch, SA v. Vendian Ent., LLC*, 256 F. Supp. 3d 497, 506–07 (S.D.N.Y. 2017) (holding pre-agreement assurances that film financier had capacity to pay were collateral, but similar

assurances were no longer collateral once contract was signed and financier became obligated to pay).

Accordingly, I dismiss the Buyer's fraud claims with prejudice insofar as they relate to improper application of payments under the agreements, with leave to plead them as a breach of contract claim. I also dismiss these claims with respect to Enzendorfer, HomeEnergy, and EnergyInvest because, as I have noted, these entities have not identified *specific contracts* they have entered into. Although I grant plaintiffs leave to amend the Breakdown document fraud claims with respect to these entities, I note that defendants have represented that "[s]imilar provisions are present in the subsequent notes and amendments." Defs.' Reply in Supp. Mot. Dismiss 9 n.9, ECF No. 49. Accordingly, plaintiffs should carefully consider whether a relevant provision of an agreement controls the application of payments before alleging the defendants' alleged conduct is fraud rather than breach of contract.[7]

### 3.  Enzendorfer's Fraud Claims Are Insufficiently Pleaded

Finally, Mr. Enzendorfer fails to state a fraud claim against Mr. Rudy. Plaintiffs plead that Mr. Rudy defrauded Mr. Enzendorfer by requesting a last-minute loan to pay Syntrol bills and promising to repay him, then failing to reimburse him. This pleading fails to meet the particularity requirements of Rule 9(b). New York law requires that, to sufficiently support a fraud claim, the misstatement or omission at issue must have been a misleading statement concerning a present fact or a promise made with the intent of not performing it. *Sabo v. Delman*, 143 N.E.2d 906, 908 (N.Y. 1957); *Perella Weinberg Partners LLC v. Kramer*, 58 N.Y.S.3d 384, 390 (N.Y. App. Div. 2017).

---

[7] Although I have previously held that HomeEnergy and EnergyInvest could not "amend their pleading so as to persuasively plead that [they] have standing to bring a breach of contract claim," Feb. Op. 26, my holding as to standing was limited to the Purchase Agreement, Security Agreement, and Loan Agreement, because the Buyer is the only plaintiff who was a party to these agreements and there are no third-party beneficiaries. *See* Feb. Op. 15–17.

Mr. Rudy's promise to reimburse Mr. Enzendorfer was not a statement of present fact. Nor have plaintiffs alleged facts supporting the inference that when Mr. Rudy promised to reimburse Mr. Enzendorfer, he did not intend to do so. Defendants' motion to dismiss Mr. Enzendorfer's fraud claim is therefore granted.

### CONCLUSION

For the reasons stated above, defendants' motion to dismiss is denied as to plaintiffs' breach of contract claim on behalf of the Buyer (Claim 1). Defendants' motion to dismiss is granted as to plaintiffs' breach of contract claim on behalf of HomeEnergy (Claim 2) and as to plaintiffs' fraud claims on behalf of all plaintiffs (Claim 3). Claim 2 is dismissed without prejudice for all plaintiffs except the Buyer, for whom the breach of contract claim was already dismissed with prejudice, unless the Buyer wishes to advance a breach of contract claim based on the Breakdown document. Claim 3 is dismissed without prejudice, but plaintiffs should note my discussion regarding whether Breakdown document-related claims should be pleaded as breaches of contract. Plaintiffs, should they choose to again amend, will have filed four versions of their complaint. Accordingly, any amendment they file will be their last. *See Ross v. Lloyds Banking Grp., PLC*, 2013 WL 603314, at *4 (S.D.N.Y. Feb. 14, 2013) ("While a court should 'should freely give leave [to amend] when justice so requires,' . . . it is wasteful and vexatious to undergo multiple rounds of amendments and motion practice to revisit rudimentary pleading defects." (quoting Fed. R. Civ. P. 15(a)(2))); *cf. Mooney v. Vitolo*, 435 F.2d 838, 839 (2d Cir. 1970) (holding that where the plaintiffs were twice given an opportunity to replead, it was "within the sound discretion of the [d]istrict [c]ourt to deny leave to replead on the third attempt").

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated: October 4, 2022
         Brooklyn, New York